

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-23-1999

# Whiteland Woods, L.P. v. Twp. of W. Whiteland

Precedential or Non-Precedential:

Docket 97-1944

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"Whiteland Woods, L.P. v. Twp. of W. Whiteland" (1999). *1999 Decisions.* Paper 263.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/263

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 23, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1944

WHITELAND WOODS, L.P.,
        Appellant

v.

TOWNSHIP OF WEST WHITELAND;
WEST WHITELAND BOARD OF SUPERVISORS;
WEST WHITELAND PLANNING COMMISSION;
DIANE S. SNYDER; JERRY POLETTO;
JACK C. NEWELL; KATHI HOLAHAN;
NANCY CARVILLE; CARL DUSINBERRE

v.

JOHN D. SNYDER

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 96-cv-08086
(Honorable Norma L. Shapiro)

Argued June 5, 1998
Before: SCIRICA, NYGAARD and SEITZ,*
Circuit Judges

Reargued December 4, 1998
Before: SCIRICA, NYGAARD and ROSENN, Circuit Judges

(Filed: September 23, 1999)

_____

*The Honorable Collins J. Seitz was a member of the original panel but
died before the matter was decided.

THOMAS A. RILEY, JR., ESQUIRE
 (ARGUED 6/5/98 and 12/4/98)
Riley, Riper, Hollin & Colagreco
240 Daylesford Plaza
P.O. Box 568
Paoli, Pennsylvania 19301

 Attorney for Appellant

THOMAS X. McANDREW, JR.,
 ESQUIRE
Siana & Vaughan
961 Pottstown Pike
P.O. Box 630
Exton, Pennsylvania 19341

JEFFREY R. BALDYGA, ESQUIRE
 (ARGUED 6/5/98)**
Siana, Shields & Vaughan
961 Pottstown Pike
P.O. Box 630
Exton, Pennsylvania 19341

 Attorneys for Appellees,
 Township of West Whiteland;
 West Whiteland Board of
 Supervisors; West Whiteland
 Planning Commission; Diane S.
 Snyder; Jerry Poletto; Jack C.
 Newell; Kathi Holahan; Nancy
 Carville; Carl Dusinberre

_____

**Jeffrey R. Baldyga, Esquire, subsequently withdrew his appearance on
behalf of Appellees, Township of West Whiteland, et al.

GEOFFREY C. JARVIS, ESQUIRE
  (ARGUED 12/4/98)
RICHARD A. SPRAGUE, ESQUIRE
Sprague & Sprague
Wellington Building, Suite 400
135 South 19th Street
Philadelphia, Pennsylvania 19103

GUY A. DONATELLI, ESQUIRE
Lamb, Windle & McErlane
24 East Market Street
P.O. Box 565
West Chester, Pennsylvania 19381-
 0565

 Attorneys for Appellee,
 John D. Snyder

OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this civil rights action, real estate developer Whiteland Woods, L.P., a subsidiary of Toll Brothers, asserts that its First and Fourteenth Amendment rights were violated by a township's refusal to allow videotaping of a meeting of the Township Planning Commission. In a parallel state court action, the township acknowledged that Pennsylvania's Sunshine Act, 65 Pa. Stat. Ann. SS 271-86 (West Supp. 1998), requires the township to allow videotaping of Planning Commission proceedings and agreed not to enforce the ban at future meetings. Whiteland Woods then filed this lawsuit under 42 U.S.C.A. S 1983 (West 1994) seeking monetary damages and attorney's fees. The District Court granted defendants' motion for summary judgment. We will affirm.

I

On June 24, 1996, Whiteland Woods filed a tentative application with West Whiteland Township, Chester County, to build a residential community on a 162.5-acre

3

parcel in the township. The application was placed on the agenda for the September 25, 1996 meeting of the West Whiteland Planning Commission.

At the September 25 meeting, attorney Thomas A. Riley presented Whiteland Woods' application to the Planning Commission. Whiteland Woods had arranged for a video camera operator to attend the meeting and record the proceedings. Apparently in response to this videotaping, Township Solicitor John D. Snyder stated early in the meeting that he intended to discuss rules governing videotaping, but that any changes to the rules would apply only to future meetings. During the meeting, Snyder prepared a resolution barring the use of all video cameras at future Planning Commission meetings. The resolution provided in part: "The following rules shall govern the use of mechanical/electrical recording and/or stenographic devices during public meetings: . . . (5) No video taping or video recording and no additional lighting shall be employed."

Jack Newell, president of the Planning Commission, placed Snyder's resolution on the agenda and Snyder presented it at the end of the meeting. Members of the Planning Commission discussed the proposed resolution, with participation by Riley and Michael Greenberg, vice president of Toll Brothers. Newell explained that he believed videotaping would inhibit candid discussion by township residents. Other members of the Planning Commission expressed resentment at being videotaped and stated that videotaping could be intimidating. Greenberg, on the other hand, said he wanted a video record of all proceedings and Riley informed the Commission that he believed allowing videotaping was required by Pennsylvania's Sunshine Act. Nevertheless, the Planning Commission adopted the resolution banning videotaping by a vote of four to two. The Planning Commission did not prevent Whiteland Woods from videotaping the September 25 meeting.

On October 4, 1996, counsel for Whiteland Woods sent the Planning Commission written notification of Whiteland Woods' intention to videotape a meeting scheduled for October 9, 1996. On October 8, 1996, Snyder wrote informing Whiteland Woods that the Township would not

4

permit videotaping and stating, "Under the circumstances, if you decide to undertake the effort and expense of bringing video cameras and videotaping equipment to the meeting you must do so at your own risk . . . ." The same day, the township's Board of Supervisors, following the lead of the Planning Commission, enacted Resolution 96-10 banning the use of video recording devices at meetings of the Board of Supervisors. Resolution 96-10 provided in part: "The following regulations shall govern the use of electrical/mechanical recording equipment during public meetings of the Board: . . . (c) Only audio recording or stenographic recording equipment may be used i.e. no video recording equipment shall be permitted . . . ."

Representatives of Whiteland Woods brought video recording equipment to the Planning Commission's October 9, 1996 meeting, but Officer John Curran of the West Whiteland Township Police Department informed Whiteland Woods' representatives they could not make a video recording of the meeting. Accordingly, Whiteland Woods left the camera facing the wall and made no videotape of the meeting.

On October 14, 1996, Whiteland Woods filed suit in the Court of Common Pleas of Chester County, seeking injunctive relief and relief under the Pennsylvania Declaratory Judgments Act, 42 Pa. Cons. Stat. Ann. S 7531-41 (West 1998), for violating the Sunshine Act, 65 Pa. Stat. Ann. S 271-86. Whiteland Woods also sought a preliminary injunction barring the Township from enforcing the two resolutions. On October 16, 1996, the Township, through counsel, wrote to the Court of Common Pleas conceding the Township could not enforce either resolution, citing Hain v. Board of Sch. Directors, 641 A.2d 661, 663-64 (Pa. Commw. Ct. 1994) (holding that the Sunshine Act requires Pennsylvania government agencies to permit videotaping of their meetings). The Township defendants waived their right to a hearing on the preliminary injunction and the Court of Common Pleas on October 17 enjoined the Township from enforcing or attempting to enforce the two resolutions or any other resolutions prohibiting the videotaping of public meetings. The Board of Supervisors and Planning Commission complied with the

injunction and did not try to enforce the resolutions. In fact, Whiteland Woods has videotaped every Board of Supervisors meeting since October 22, 1996.

Whiteland Woods then sought additional relief, filing a suit in the Court of Common Pleas for Chester County on November 13, 1996 for alleged violations of the First and Fourteenth Amendments under 42 U.S.C.A. S 1983 (West 1994), the Pennsylvania Constitution, and Pennsylvania's Sunshine Act. The complaint sought damages in excess of $2,100,000 and attorney's fees.1 The Township removed the case to federal court and filed a third-party complaint against Snyder, alleging that he advised the Commission that it legally could adopt the resolution barring videotaping. The Planning Commission rescinded its resolution on December 11, 1996; the Board of Supervisors rescinded Resolution 96-10 on December 18, 1996.

The District Court granted summary judgment on behalf of the Township defendants on the S 1983 claims. The court held the ban was not a violation of the First Amendment because it was a reasonable time, place, and manner restriction and dismissed the Fourteenth Amendment claim because the Township's conduct did not constitute a substantive due process violation. The court also determined that plaintiff 's request for injunctive relief was moot. After disposing of the federal claims, the District Court declined to exercise supplemental jurisdiction over plaintiff 's state law claims or the Township's claim against Snyder. See Whiteland Woods v. Township of West Whiteland, No. 96-CV-8086, 1997 WL 653906, at *4-*8 (E.D. Pa. Oct. 21, 1997).

II

The District Court had federal question jurisdiction under 28 U.S.C. S 1331. We have jurisdiction under 28 U.S.C. S 1291. We exercise plenary review of a grant of summary

_____

1. Initially, Whiteland Woods also sought relief based on the failure of the
Board of Supervisors and Planning Commission to rescind promptly the unenforceable resolutions. The District Court rejected that theory and Whiteland Woods does not press it on appeal.

judgment. See Wicker v. Consolidated Rail Corp. , 142 F.3d 690, 696 (3d Cir. 1998). We view all evidence and draw all inferences therefrom in the light most favorable to the non-moving party and grant summary judgment if no reasonable jury could find for the non-moving party. See Sameric Corp v. City of Philadelphia, 142 F.3d 582, 590 (3d Cir. 1998).

III

A

The primary issue on appeal is whether there is a federal constitutional right to videotape public meetings of a township planning commission when other effective means of recording the proceedings are available. "It is now well established that the Constitution protects the right to receive information and ideas." Stanley v. Georgia, 394 U.S. 557, 564 (1969). Because a "major purpose of[the First] Amendment was to protect the free discussion of governmental affairs," Globe Newspaper v. Superior Ct., 457 U.S. 596, 604 (1982) (internal quotation marks omitted), the public and press have the right to attend certain types of governmental proceedings. See, e.g., id. at 603 (criminal trials); Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1067-1070 (3d Cir. 1984) (civil trials).

We have no hesitation in holding Whiteland Woods had a constitutional right of access to the Planning Commission meeting on October 9, 1996. Whether the public has a First Amendment right of access to a particular government proceeding depends on "two complementary considerations." Capital Cities Media, Inc. v. Chester, 797 F.2d 1164, 1174 (3d Cir. 1986). First, "because a tradition of accessibility implies the favorable judgment of experience," we must consider "whether the place and process has historically been open to the press and general public." Id. (quoting Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 8 (1986)) (internal quotation marks omitted). Second, we evaluate "whether public access plays a significant positive role in the functioning of the particular process in question." Id. In the context of judicial

7

proceedings, we have identified six factors pertinent to the application of the second prong:

> [1] promotion of informed discussion of governmental affairs by providing the public with the more complete understanding of the judicial system; [2] promotion of the public perception of fairness which can be achieved only by permitting full public view of the proceedings; [3] providing a significant community therapeutic value as an outlet for community concern, hostility and emotion; [4] serving as a check on corrupt practices by exposing the judicial process to public scrutiny;[5] enhancement of the performance of all involved; and[6] discouragement of perjury."

United States v. Simone, 14 F.3d 833, 839 (3d Cir. 1993) (bracketed numbers in original).

Public access to Township Planning Commission Meetings is guaranteed by the Pennsylvania Municipalities Planning Code of 1968 S 209(10), 53 Pa. Stat. Ann. S 10209(10) (West 1998), and by the Sunshine Act of 1986, 53 Pa. Stat. Ann. SS 271-86, see Moore v. Township of Raccoon, 625 A.2d 737, 740 (Pa. Commw. Ct. 1993). Although the Planning Commission serves in an advisory capacity only, see Heck v. Zoning Hearing Bd. , 397 A.2d 15, 19 (Pa. Commw. Ct. 1979), "[t]he General Assembly . . . intended that planning commissions play an active role in all aspects of municipal development and land use." Moore, 625 A.2d at 739. Public access to the Commission's meetings complies with the standards set forth in Capital Cities and advances the interests identified in Simone. Public awareness of land use matters and the perception of fairness are fostered by the presence of affected members of the township at Commission meetings. Participants in these meetings, whether members of the Commission or witnesses providing testimony, are put on notice that their actions will be evaluated by the community. Consequently, we believe the Planning Commission meetings are precisely the type of public proceeding to which the First Amendment guarantees a public right of access.

But the public's right of access is not absolute. In holding that a criminal trial may not be completely closed to the public, the Supreme Court emphasized,

8

> [O]ur holding today does not mean that the First
> Amendment rights of the public and representatives of
> the press are absolute. Just as a government may
> impose reasonable time, place, and manner restrictions
> upon the use of its streets in the interest of such
> objectives as the free flow of traffic, so may a trial
> judge, in the interest of the fair administration of
> justice, impose reasonable limitations on access to a
> trial. "[T]he question in a particular case is whether
> that control is exerted so as not to deny or
> unwarrantedly abridge . . . the opportunities for the
> communication of thought and the discussion of public
> questions immemorially associated with resort to
> public places."

Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 581 n.18 (1980) (plurality opinion) (quoting Cox v. New Hampshire, 312 U.S. 569, 574 (1941)) (citations omitted); see also id. at 600 (Brennan, J., concurring); Globe Newspaper, 457 U.S. at 607 n.17. The Supreme Court also found no constitutional violation in the denial of a press request for access to county jail facilities for the purpose of investigating conditions in the jail, noting it had "never intimated a First Amendment guarantee of a right of access to all sources of information within government control" and that the "undoubted right to gather news . . . affords no basis for the claim that the First Amendment compels others--private persons or governments--to supply information." Houchins v. KQED, Inc., 438 U.S. 1, 9, 11 (1978) (plurality opinion). Thus, the First Amendment does not require unfettered access to government information.

The District Court analyzed Whiteland Woods' First Amendment claim under the traditional public forum doctrine.2 See Whiteland Woods, 1997 WL 653906, at *6.
_____

2. The government's ability to restrict speech is limited in speech fora.

> The Court has identified three types of fora: the traditional public
> forum, the public forum created by government designation, and the
> nonpublic forum. Traditional public fora are defined by the objective
> characteristics of the property, such as whether, by long tradition or
> by government fiat, the property has been devoted to assembly and
> debate. . . .

The Court of Appeals for the Eleventh Circuit has also
analyzed prohibitions on recordings of public proceedings
under standards similar to those applied to time, place, and
manner restrictions on speech in a public forum. See
Blackston v. Alabama, 30 F.3d 117, 120 (11th Cir. 1994)
(per curiam) (denying summary judgment to defendants for
prohibiting audio recording of the Alabama Supreme Court
Advisory Committee on Child Support Guidelines because
plaintiffs alleged a non-content-neutral prohibition); United
States v. Hastings, 695 F.2d 1278, 1282 (11th Cir. 1983)
(upholding prohibition on videotaping, photographing, and
radio broadcasting in the courtroom). In contrast, the

_____

> Designated public fora, in contrast, are created by purposeful
> governmental action. The government does not create a designated
> public forum by inaction or by permitting limited discourse, but
only
> by intentionally opening a nontraditional public forum for public
> discourse. . . .
>
> Other government properties are either nonpublic fora or not fora
> at all.

Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (1998)
(citations, internal quotation marks, and alterations omitted). Time,
place, and manner restrictions on speech in a public forum are
permissible "provided [1] the restrictions are justified without reference
to the content of the regulated speech, [2] that they are narrowly
tailored
to serve a significant governmental interest, and[3] that they leave open
ample alternative channels for communication of the information." Ward
v. Rock Against Racism, 491 U.S. 781, 791 (1989) (internal quotation
marks omitted). Restrictions on speech in a non-public forum must be
reasonable and content-neutral. See Arkansas Educ. Television Comm'n,
523 U.S. at 677-78.

In addition, the Supreme Court has discussed "limited" public fora,
which are designated for expression, but only on limited topics. See,
e.g.,
Rosenberger v. Rector and Visitors of Univ., 515 U.S. 819, 829 (1995).
Although there is some uncertainty whether limited public fora are a
subset of designated public fora or a type of nonpublic fora, see
Summum v. Callaghan, 130 F.3d 906, 914-15 (10th Cir. 1997)
(discussing cases), we have generally applied to limited public fora the
constitutional requirements applicable to designated public fora. See
Christ's Bride Ministries, Inc. v. Southeastern Pa. Transp. Auth., 148
F.3d
242, 248-55 (3d Cir. 1998).

Courts of Appeals for the Seventh and Second Circuits have required only that restrictions on videotaping or audiotaping be content-neutral and reasonable, the standards applied to speech in a nonpublic forum. See United States v. Kerley, 753 F.2d 617, 620-21 (7th Cir. 1985) (upholding exclusion of television cameras from criminal trial); United States v. Yonkers Bd. of Educ., 747 F.2d 111, 114 (2d Cir. 1984) (upholding ban on audiotape recording of civil trial).

We are not convinced that forum analysis is necessary to resolve such restrictions on the right of access. Traditionally, the speech forum doctrine applies to "expressive" or "speech" activity. See Perry Educ. Ass'n v. Local Educators Ass'n, 460 U.S. 37, 45 (1983) (discussing a public forum as a place for "expressive activity"); Brody v. Spang, 957 F.2d 1108, 1117 (3d Cir. 1992) ("The Supreme Court has adopted a framework of forum analysis to assess whether a government entity must permit speech or expressive activity on its property."). Whiteland Woods does not allege the Township interfered with its speech or other expressive activity. Rather, the alleged constitutional violation consisted of a restriction on Whiteland Woods' right to receive and record information. In a similar context, the Court of Appeals for the Second Circuit found forum analysis inapplicable to CNN's attempt to televise a libel trial:

> [I]t has never been suggested that there is a link between the First Amendment interest that a litigant has in his trial as a "form of expression" and the right that the public may have to view that expression on television. Whatever public forum interest may exist in litigation, that interest is clearly a speaker's interest, not an interest in access to the courtroom. Because the ability of neither General Westmoreland nor CBS to express views at trial is altered by the presence or absence of television cameras, CNN's public forum argument is, by itself, inapposite.

Westmoreland v. Columbia Broadcasting Sys., Inc. , 752 F.2d 16, 21-22 (2d Cir. 1984). Westmoreland was decided three days after Yonkers Board of Education, which, as noted, evaluated a ban on audio recording using criteria similar to

11

those governing restrictions on expressive speech in a nonpublic forum. See 747 F.2d at 114 (upholding the ban because it was content-neutral and reasonable). Although the two panels applied somewhat different tests to the similar questions before them, their analyses are consistent. The critical question regarding a content-neutral restriction on the time, place, or manner of access to a government proceeding is whether the restriction meaningfully interferes with the public's ability to inform itself of the proceeding: that is, whether it limits the underlying right of access rather than regulating the manner in which that access occurs.

In this case, Whiteland Woods' right of access to the October 9 Planning Commission meeting was not meaningfully restricted by the ban on videotaping. The Township did not curtail Whiteland Woods' ability to express its views before the Planning Commission or to compile an accurate record of the proceedings. Nor did it prohibit interested parties, reporters, or members of the public from attending the meetings or limit the gathering of information by means other than by videotaping. Spectators were free to take notes, use audio recording devices, or even employ stenographic recording. Nothing in the record suggests videotaping would have provided a uniquely valuable source of information about Planning Commission meetings. The First Amendment does not require states to accommodate every potential method of recording its proceedings, particularly where the public is granted alternative means of compiling a comprehensive record. See Combined Communications Corp. v. Finesilver, 672 F.2d 818, 821 (10th Cir. 1982) (upholding ban on television coverage of court-ordered negotiations over electoral redistricting where members of the press were permitted to attend the meetings and take notes); Garrette v. Estelle, 556 F.2d 1274, 1279 (5th Cir. 1977) (upholding prison's prohibition on filming execution because there were other methods of informing the public of the execution); Johnson v. Adams, 629 F. Supp. 1563, 1564-65 (E.D. Tex. 1986) (holding county commissioners may ban video recording of meetings where audiotaping was permitted). To put it another way, plaintiff has failed to demonstrate an essential nexus between the right of access and a right to videotape

12

the Planning Commission proceedings. See Westmoreland, 752 F.2d at 23 ("There is a long leap . . . between a public right under the First Amendment to attend trials and a public right under the First Amendment to see a given trial televised."). Accordingly, we believe Whiteland Woods has failed to demonstrate any deprivation of its First Amendment rights.

Whiteland Woods relies primarily on Cable News Network, Inc. v. American Broadcasting Companies, Inc., 518 F. Supp. 1238 (N.D. Ga. 1981), in which the court considered restrictions on the press coverage of presidential activities. When only limited numbers of media representatives could be admitted to a given event, the Reagan administration admitted a media "pool" including a single television camera crew, which shared its feed with others seeking to cover the event. Traditionally, the pool representative had rotated among the three established television networks: ABC, CBS, and NBC. When CNN sought to be included in the rotation, the administration announced that television representatives would be banned from pooled coverage unless the four networks agreed among themselves to a pool rotation system. In striking down this restriction, the court found that television coverage of these events had traditionally been permitted, that such coverage provided information qualitatively different from that available through print media, and that the administration's motive was to avoid designating members of the pool rather than terminate press coverage. See id. at 1244–45. Because none of these factors is present here, we believe Cable News Network is inapposite.3

We conclude that Whiteland Woods' right of access to Planning Commission meetings did not create a federal constitutional right to videotape the meetings. Whiteland Woods was allowed to attend all the meetings of the Planning Commission, including the October 9 session, and

_____

3. Whiteland Woods also cites Maurice River Township Bd. of Educ. v. Maurice River Township Teachers Ass'n, 455 A.2d 563 (N.J. Super. Ct. Ch. Div. 1982) (holding that the public had the right to videotape school board meetings). But that decision was based on New Jersey common law, not the First Amendment. See id. at 564.

13

to compile a full record of the proceedings, whether by written and stenographic notes or audiotaping. Therefore, we believe the restriction on videotaping did not violate the First Amendment.

B

Whiteland Woods also claims the Township violated its Fourteenth Amendment substantive due process rights when Officer Curran informed its representatives they could not videotape the October 9, 1996 meeting. Whiteland Woods does not base its claim on an alleged infringement of its fundamental rights under the First Amendment but instead on "what is arguably the most frightening and egregious abuse of governmental power which is the illegal deprivation of liberty by a municipal government through the raw use of its police force." (Appellant's Br. at 26.)

We have recently reviewed the substantive limitations imposed by the due process clause on executive action such as police conduct:

> "The touchstone of due process is the protection of the individual against arbitrary action of government." . . . [W]here abusive action by a member of the executive branch is alleged, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." To generate liability, executive action must be so ill-conceived or malicious that it "shocks the conscience."

Miller v. City of Philadelphia, 174 F.3d 368, 374-75 (3d Cir. 1999) (quoting Wolff v. McDonnell, 418 U.S. 539 (1974); County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) (citation and internal quotation marks omitted)). The District Court found that this standard had not been met: "The police officer was requiring compliance with a duly-enacted resolution the Planning Commission believed was in the best interest of the public . . . . [A] police officer's verbal instruction to comply with the law does not, without more, amount to `arbitrary action of government.' " Whiteland Woods, 1997 WL 653906, at *7 (quoting Wolff, 418 U.S. at 558). We agree. In requiring compliance with the resolution, Officer Curran was acting in a rational

14

manner. Contending that violation of the resolution was not a criminal offense, Whiteland Woods suggests that if the Township thought plaintiff's actions were illegal, "the appropriate thing to do would have been to seek redress through the Court--not through enforcement by an armed policeman." Plaintiff cites no authority for this position, nor does it explain how Curran's conduct rises to the level of a substantive due process violation.

IV

For the foregoing reasons, we will affirm the grant of summary judgment.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

15