PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1632
_____

MERRY REED; PHILADELPHIA BAIL FUND

v.

FRANCIS BERNARD ARRAIGNMENT COURT
MAGISTRATE JUDGES;
SHEILA BEDFORD; KEVIN DEVLIN; JAMES O'BRIEN;
CATERIA MCCABE;
ROBERT STACK IN THEIR OFFICIAL CAPACITIES;
PRESIDENT JUDGE
PATRICK DUGAN IN HIS OFFICIAL CAPACITY;
SHERIFF OF PHILADELPHIA

Francis Bernard, Sheila Bedford, Kevin Devlin,
James O'Brien, Cateria McCabe and Robert
Stack,

Appellants
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 2-19-cv-03110)
District Judge:  Honorable Harvey Bartle, III

_____

Argued June 30, 2020

BEFORE: KRAUSE, PHIPPS, and GREENBERG, <u>Circuit Judges</u>.

(Filed:  September 29, 2020)
_____

Michael L. Berry
Paul J. Safier
Shawn Summers
Ballard Spahr
1735 Market Street
51st Floor
Philadelphia, PA 19103

Robert D. Friedman
Nicolas Y. Riley (argued)
Georgetown University Law Center
Institute for Constitutional Advocacy
and Protection
600 New Jersey Avenue, N.W.
Washington, DC 20001

    <u>Attorneys for Appellees</u>

Aaron J. Marcus
Defender Association of Philadelphia
1441 Sansom Street
Philadelphia, PA 19102

Matthew Stiegler
7145 Germantown Avenue
Suite 2
Philadelphia, PA 19119

Katie Townsend
The Reporters Committee for
    Freedom of the Press
1156 15th Street. N.W.
Suite 1020
Washington, DC 20005

    Attorneys for Amici Curiae

Michael Daley (argued)
Megan L. Davis
Supreme Court of Pennsylvania
Administrative Office of Pennsylvania Courts
1515 Market Street
Suite 1414
Philadelphia, PA 19102

    Attorneys for Appellants

_____

OPINION OF THE COURT
_____


GREENBERG, Circuit Judge.

## I.      INTRODUCTION

This matter comes on before this Court on the appeal of defendant-appellants Arraignment Court Magistrate Judge Francis Bernard, et al. ("appellants" or the "Arraignment Magistrates"). Appellants appeal from the District Court's February 25, 2020 Order granting summary judgment in favor of appellee Philadelphia Bail Fund ("appellee" or the "Bail Fund") and holding that certain state and local rules precluding verbatim recording of bail proceedings violate the First Amendment. For the reasons that follow, we will reverse.

## II. STATEMENT OF FACTS AND PROCEDURAL HISTORY

An individual arrested[1] in Philadelphia typically is brought before an Arraignment Court Magistrate (hereinafter, "bail magistrate") at the City's Criminal Justice Center for a preliminary arraignment (hereinafter, "bail hearing").[2] Bail

---

[1] After an arrest, law enforcement processes the arrestee and creates a police arrest report. Thereafter, Pretrial Services interviews the arrestee and inquires into certain biographical information, including the arrestee's residence, employment, health, and education level. The results of that interview are compiled into a report, which then is submitted to the bail magistrate prior to the bail hearing.

[2] The arrestee ordinarily is confined at a Philadelphia police precinct. The bail magistrate, prosecutor, defender, and (if applicable) the public are located in a bail hearing courtroom in the basement of the Philadelphia Criminal Justice Center. The arrestee appears in court via an audio-visual link on a monitor, and all participants are able to hear and see each other via the

4

hearings may be held twenty-four hours per day, seven days per week, three-hundred and sixty-five days per year. On average, each bail hearing lasts approximately four minutes.

At the bail hearing, the bail magistrate hears oral argument from the prosecutor and defender, considers certain statutory factors and biographical information, and, if appropriate, sets bail. If an arrestee seeks review of the bail magistrate's decision, an emergency municipal court judge is available to conduct an immediate de novo review by telephone.

The bail hearings are open to the public, but transcripts of the hearings are not made and audio recordings are not available to the public.[3] Following the bail hearing, however,

---

audio-visual link.

[3] The bail hearings are audio-recorded but for "internal review purposes" only. (JA 061.) It is undisputed that these unofficial audio recordings are not created in accordance with Pennsylvania's First Judicial District Digital Recording Program, which governs the production of official court recordings. Moreover, the quality of these unofficial recordings and whether they adequately and accurately capture the contents of bail hearings is questionable. Indeed, all parties agreed to admit as part of the record that the unofficial audio recordings are of "inferior quality and often hard to hear". (JA 012; see also JA 012 n.5.) Thus, the fact that the Philadelphia Municipal Court creates unofficial audio recordings of the bail hearings cannot be regarded as a basis on which to hold that verbatim documentation of bail hearings already exists. Nevertheless, we realize that the dissent makes much of the fact that, in order

5

the public may access and obtain copies of court documents related to the hearing, including the bail bond, the criminal complaint, the bail hearing subpoena, and a bail appeal report if the arrestee appealed. Those documents, however, do not include information such as the parties' arguments and the bail magistrate's reasoning for his or her decision.

The appellee Bail Fund is a nonprofit organization that seeks to enforce what it regards as justice within Philadelphia's bail system. Among other things, the Bail Fund sends volunteers into Philadelphia bail hearings to observe and report on the proceedings and uses information volunteers compile to produce public reports and educate Philadelphia citizens and government officials.

The Bail Fund avers that "[i]ts volunteers take extensive notes on the proceedings but the rapid, back-to-back, jargon-filled nature of the hearings makes it impossible for them to document every point or word exchanged." (Bail Fund ("BF") Br. at 6.) Because of that limitation, it sought permission to create its own audio recordings of bail hearings. The President Judge of the Philadelphia Municipal Court denied that request, noting that state rules prohibit the public from recording bail hearings.

---

to comply with the District Court's order, the Municipal Court has begun to make available certified transcripts of bail hearings based upon these recordings. See e.g., Dissent at 24 n.7. (Status Rpt., Exh. A, ECF No. 38.) This retrospective discussion elevates results over process and loses sight of the fact that the issue before us is whether the First Amendment mandated their creation at the outset, not whether they can be made.

Subsequently, the Bail Fund initiated this action, raising an as applied First Amendment challenge to the following three rules (hereinafter and collectively, the "challenged Rules"): Pennsylvania Rule of Criminal Procedure 112(C); Pennsylvania Rule of Judicial Administration 1910(B); and Philadelphia Municipal Court Arraignment Court Magistrate Rule 7.09.[4] The District Court in a comprehensive opinion granted summary judgment in the Bail Fund's favor, holding that the challenged Rules infringed on the Bail Fund's First Amendment right of access to the bail hearings so long as the Philadelphia Municipal Court did not make official audio recordings or transcripts of the hearings available to the public. Consequently, it ordered that the Bail Fund must be allowed to audio-record bail hearings so long as the Philadelphia Municipal Court did not create publicly available transcripts or audio recordings of those proceedings.

### III.    DISCUSSION

The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a district court's summary

---

[4] Pennsylvania Rule of Criminal Procedure 112(C) prohibits the public from making "stenographic, mechanical, or electronic recording[s]" of criminal proceedings; Pennsylvania Rule of Judicial Administration 1910(B) states that "judges shall prohibit broadcasting, televising, recording or taking photographs in the courtroom"; and Local Arraignment Court Magistrate Rule 7.09 specifically directs bail magistrates to "prohibit broadcasting, televising, recording, or taking photographs in the [c]ourtroom."

judgment ruling. See, e.g., Melrose, Inc. v. City of Pittsburgh, 613 F.3d 380, 387 (3d Cir. 2010).

The issue before this Court is whether the challenged Rules as applied to the Bail Fund impede its First Amendment right of access to Philadelphia bail hearings by precluding the Bail Fund from obtaining a verbatim record of those proceedings. The Arraignment Magistrates argue there is only a constitutional right of access to courtroom proceedings and documentation resulting from those proceedings, not a right to make audio recordings of courtroom proceedings. Further, they contend that because the states have the freedom to make laws pursuant to their own policy choices, the Pennsylvania court system was within its right to prohibit audio recordings. (See Arraignment Magistrates ("AM") Br. at 19.) Thus, per the Arraignment Magistrates, the Bail Fund's constitutional right of access has been satisfied because it has the ability to attend and observe bail hearings; take notes at those hearings; obtain bail information and the criminal complaint immediately after a bail hearing; access online dockets, which include bail information; and obtain bulk data[5] pertaining to the bail hearings. Accordingly, the Arraignment Magistrates contend that the Bail Fund seeks to extend the First Amendment right of access into a right to make or require the creation of audio recordings, but that "[j]ust because some states make different policy choices" the claimed First Amendment right does not exist. (AM Reply Br. at 1; see also AM Br. at 19-20.)

---

[5] The bulk data for each case includes 44 different categories of information, including the bail type, amount, and whether it was posted, as well as data regarding the individual defendant, such as his or her race, sex, age, and residence zip code.

8

The Bail Fund argues that it does not seek an "unfettered right" to audio-record all judicial proceedings; rather, it only seeks to audio-record bail hearings because those hearings occur off-the-record and there is no verbatim documentation of those proceedings available to them. (BF Br. at 2.) Per the Bail Fund, although its volunteers are permitted to take handwritten notes, "it [is] impossible for [the volunteers] to document every point or word exchanged" during the bail hearings. (BF Br. at 6.) It further avers that the records available to it, such as bulk data information, are inadequate because they lack essential information, such as the parties' arguments and the bail magistrate's reasoning for his or her decision. Thus, the Bail Fund contends that the challenged Rules are unconstitutional because they prohibit it from obtaining a verbatim record of the bail proceedings. We disagree.

At the outset of our analysis we observe that it is undisputed that the Bail Fund is able physically to attend and take handwritten notes at bail hearings. In fact, the Bail Fund concedes that "[a]ll of the [bail] hearings are held in open court and members of the press and the public are free to attend and take notes on the proceedings." (BF Br. at 5.) Further, the parties agree that the First Amendment right of access to the courtroom includes a right to access to documents resulting from those court proceedings. See United States v. Antar, 38 F.3d 1348, 1361 (3d Cir. 1994) (stating that "the First Amendment right of access must extend equally to transcripts as to live proceedings").

What is in dispute is whether the right of access includes an affirmative requirement that the judiciary create or allow the creation of verbatim records of its proceedings. We hold that precedent does not mandate that it does; rather, the law takes a

9

more modest approach and requires that judicial records—assuming they exist—are generally available to the public. <u>Cf. Nixon v. Warner Comm'cs, Inc.</u>, 435 U.S. 589, 597, 98 S. Ct. 1306, 1312 (1978) (discussing the common law right of access to judicial records).[6] Here, by announcing a requirement that the Philadelphia Municipal Court either create and release

---

[6] The dissent's contention that our opinion confuses the First Amendment right of access with its common law predecessor is baseless. <u>See</u> Dissent at 36-38. Although this mischaracterization may bolster an overly broad reading of our First Amendment precedent, the dissent finds no support for its assertion in our analysis, as exemplified by its reliance on our reference to <u>Nixon</u>, 435 U.S. at 597, a citation clearly preceded by a "cf." signal and, importantly, recognizing the permissive nature of the common law right of access to judicial documents. <u>See also</u> <u>Antar</u>, 38 F.3d at 1361 (recognizing that the "common law right has played a crucial role in the development of First Amendment jurisprudence"). Moreover, in arguing that we conflate the First Amendment right of access with the District Court's fashioned remedy, <u>see</u> Dissent at 38-40, the dissent emphatically contends that the First Amendment right of access is, at heart, a right to information, a point not in dispute, <u>see</u> Dissent at 38. Yet, as noted, even under the challenged Rules, the Bail Fund maintains access to a mass of information, not merely access to the courtroom itself and the notes its volunteers take at the bail hearings, but also the criminal complaint, court docket, and bulk data information. The Bail Fund is able to, and indeed has, disseminated this information to the public. Of note here, however, is that the Bail Fund seeks a specific kind of information—a verbatim record (<u>see</u> Oral Arg. Tr. 37:16-18)—and it is on this issue that we focus.

verbatim recordings or allow the Bail Fund to make its own audio recordings, the District Court broadened the First Amendment right of access.[7] But neither the Constitution nor judicial precedent provides for such a requirement, and if we established such a requirement, we would be making new law.

The Supreme Court's and our decisions in Antar and Press-Enterprise do not alter our decision. See Antar, 38 F.3d 1348; Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 106 S. Ct. 2735 (1986). In Antar, we held that, assuming there are transcripts of a proceeding, the First Amendment right of access extends equally to the transcripts as well as the courtroom proceedings giving rise to those transcripts. See 38 F.3d at 1361. In Press-Enterprise, the Supreme Court similarly determined that the district court erred in sealing the transcript of a criminal preliminary hearing. See 478 U.S. at 13, 106 S. Ct. at 2743. These cases, which concern restricted access to documentation already in existence, are inapposite to the issue currently before us which concerns the creation of documents or audio recordings. To be sure, we are not suggesting that the Bail Fund would not typically be entitled to transcripts of bail hearings had the Philadelphia Municipal Court created them; rather, we hold today that the First Amendment does not mandate either their creation or the allowance or their creation. The same principle presumably applies to mandating the creation of audio recordings.

Nor does our holding in Whiteland Woods, LP v. Township of West Whiteland, 193 F.3d 177 (3d Cir. 1999) stand for the proposition that courts must create or allow the

---

[7] We agree that the First Amendment right of access applies to bail hearings—a matter that was not in dispute, but nonetheless had not yet been addressed by this Court. See Dissent at 13.

11

creation of verbatim records of their proceedings. In <u>Whiteland Woods</u>, we considered whether a real estate developer's First Amendment right of access was infringed when it was prohibited from videotaping a planning commission meeting. <u>See</u> <u>id.</u> at 178. Ultimately, we determined that the Township's videotaping ban did not "meaningfully interfere" with the developer's First Amendment right of access, and in so holding, we noted that the public had "alternative means of compiling a comprehensive record." <u>Id.</u> at 183; <u>see also</u> <u>id.</u> at 184.

Based upon the above language, the Bail Fund infers that courts are required to create or allow the creation of verbatim documentation of the proceedings so that a "comprehensive record" may exist. (BF Br. at 20.) As such, the Bail Fund contends that because there is no verbatim recordings of bail hearings, it has no means of obtaining a complete and comprehensive record of those proceedings. (<u>See</u> BF Br. at 19-21.)

The Bail Fund's argument fails in two respects. First, it ignores the circumstance that the standard we articulated in <u>Whiteland Woods</u>, and the essential inquiry for the Court to consider, is meaningful interference; to wit: we must consider whether the challenged Rules meaningfully interfere with the public's ability to inform itself about bail hearings. Here, the Bail Fund is able to attend bail hearings and take handwritten notes at those hearings. That the Bail Fund's volunteers may not be able to capture every word spoken does not meaningfully interfere with the public's ability to inform itself of the proceedings. In fact, the Bail Fund successfully informs the public about matters occurring during bail hearings by publishing reports on its observations and findings. Moreover, the public may obtain documentation relating to the bail hearings, such as the criminal complaint and bulk data

12

information, as well as access online dockets.

Second, the Bail Fund erroneously equates "comprehensive record" with "verbatim record". The Bail Fund contends that under the instant circumstances those terms are synonymous because in Whiteland Woods we noted that the real estate developer's other means of compiling a comprehensive record included methods that would allow for verbatim transcription. That argument, however, not only relies on dicta, but is founded on an erroneous assumption we never articulated. In fact, in Whiteland Woods, we approvingly cited Combined Communications Corp. v. Finesilver, 672 F.2d 818, 821 (10th Cir. 1982)[8] and Garrett v. Estelle, 556 F.2d 1274, 1279 (5th Cir. 1977)[9] because in those matters, "members of the press were

_____

[8] In Finesilver, the Court of Appeals for the Tenth Circuit denied a petition for a writ of mandamus that sought to require a district court to allow television coverage of settlement negotiations taking place at a federal courthouse. See Finesilver, 672 F.2d at 819. The district court allowed the press to be present during the negotiations but prohibited the placement of television cameras in the meeting rooms. Id. at 820. In denying the petition, the court of appeals noted that the petitioner "was not denied access to the meetings" because "[i]ts representative was free to attend, take notes, and disseminate any information obtained." Id. at 821.

[9] In Garrett, the Court of Appeals for the Fifth Circuit noted that the press and the public were permitted to witness prisoner executions, but that the press was not permitted to film the executions because, among other things, "the [F]irst [A]mendment[] does not impose upon government 'the affirmative duty to make available to journalists sources of

13

permitted to attend the meetings and take notes" as well as had "other methods of informing the public" beyond electronic recordings. See Whiteland Woods, 193 F.3d at 183. Thus, we reject the Bail Fund's attempt to create a standard centered on whether or not there exists a verbatim record.

We acknowledge that a verbatim record may further assist the Bail Fund with its mission. Our role, however, is not to determine whether it would be a good policy to require the creation of on-the-record bail hearings and the dissemination of a transparent and verbatim record of those hearings. Rather, we must determine the parameters of the First Amendment and whether the creation of such verbatim recordings is constitutionally mandated. Put simply, just because something may be a good policy does not mean that it rises to the level of a constitutional right. Accordingly, we will reverse the District Court's February 25, 2020 Order finding the challenged Rules unconstitutional and entering summary judgment in favor of the Bail Fund. We will remand the case to that Court to enter summary judgment in favor of the Arraignment Magistrates.

---

information not available to members of the public generally.'" Garrett, 556 F.2d at 1279 (quoting Pell v. Procunier, 417 U.S. 817, 834-35, 94 S. Ct. 2800, 2810 (1974)).

## Reed v. Bernard
## No. 20-1632

KRAUSE, *Circuit Judge*, dissenting.

With the Majority's holding today, what we give with one hand, we take back with the other. All parties and members of the panel agree that the First Amendment right of access applies to bail hearings. Yet the Majority proceeds to eviscerate that right: Despite Supreme Court precedent and our own case law holding that the public is entitled to a complete and verifiable record of proceedings to which the right of access attaches, the Majority allows the government—having refused to produce any transcript or audio recording of its own—to also prohibit the public from making even an unobtrusive recording in circumstances where there is no other means of obtaining a complete and verifiable record of what transpired. The Majority thus deprives the public of access to vital information about one of the most urgent and vigorously debated issues in the modern criminal justice arena. And, even more alarming, its *ratio decidendi* is not limited to bail hearings but applies to every proceeding to which the right of access attaches with grave consequences for public discourse and confidence in government institutions.

This troubling result reflects a fundamental misunderstanding of the First Amendment: Access means more than the ability to "squeeze through the [courthouse] door." *United States v. Antar*, 38 F.3d 1348, 1360 (3d Cir. 1994). It means the public's right of "access to *information*" about "what occur[s]" in the halls of justice, "not only by witnessing a proceeding firsthand, but also by learning about it through a secondary source." *Id.* And where a restriction "meaningfully

interferes with the public's ability to inform itself of the proceeding" by preventing the compilation of an "accurate" and "comprehensive record," *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177, 183 (3d Cir. 1999), it is unconstitutional unless narrowly tailored to serve an overriding interest.

These settled principles should be leading us to affirm the narrow and targeted relief granted by the District Court. Each week, hundreds of bail hearings are held around the clock in the bowels of Philadelphia's Criminal Justice Center. There are no written submissions, court reporters, or transcripts to capture the arrestees' statements, the parties' arguments, or the magistrates' reasoning. Nor is there any other reliable way for the public to gain access to that critical information. State law allows a magistrate, prosecutor, or arrestee to record a bail hearing—but only "for subsequent use in [the] case," not for "public[] . . . disseminat[ion] in any manner." Pa. R. Crim. P. 112(D). The Municipal Court produces audio recordings of every bail hearing that, it concedes, are of sufficient quality to be used to produce certified transcripts—but it precludes the public from accessing those recordings and uses them only for internal purposes, including "monitor[ing] the performance of the magistrates." *Phila. Bail Fund v. Arraignment Ct. Magistrate Judges*, 440 F. Supp. 3d 415, 418–19 (E.D. Pa. 2020). And a handful of members of the public can attend the proceedings—but without notice of any arrestee's hearing before it is called and without the ability to use equipment, no matter how unobtrusive, to record what is said.

So the Bail Fund, whose mission is to collect comprehensive information about Philadelphia bail hearings to be shared with city officials and the public, must send volunteers

2

into the Criminal Justice Center at all hours of the day and night armed only with a pen and paper—and a hope that their furious scribblings during the hearings they happen to witness will produce useful data. These circumstances "meaningfully interfere[]" with the public's right to access information about bail hearings. *Whiteland Woods*, 193 F.3d at 183. And the justifications offered in support of the challenged restrictions are concededly unsubstantiated and poorly tailored. For these reasons, the District Court was correct in finding a First Amendment violation and, exercising its equitable discretion, in crafting a remedy: Going forward, the Municipal Court could make its audio recordings or transcripts created from those recordings available to the public, or else the Fund would be allowed to produce its own audio recordings.[1] We should affirm the District Court's thorough and sensible decision.

In reversing, the Majority neglects that the First Amendment protects the right to *comprehensive* and *accurate* information and glosses over undisputed evidence that the challenged restrictions meaningfully interfere with that right. Instead, it fixates on a more metaphysical inquiry: whether the First Amendment right is limited to "documentation already in

---

[1] The District Court's chosen remedy reflects a measured approach to implementing the First Amendment right at issue. In particular, the Court ordered that the Bail Fund "may make its own audio recordings of bail hearings in the Philadelphia Municipal Court with silent handheld recorders beginning on June 9, 2020 but only if the Philadelphia Municipal Court does not make available by that time official audio recordings or transcripts of bail hearings of the same type and quality and in the same manner that are made available for other types of judicial proceedings." J.A. 125.

3

existence" or instead "includes an affirmative requirement that the judiciary create or allow the creation" of records (emphasis omitted). Maj. Op. 9, 11. That fixation leads the Majority away from governing precedent, which requires that we focus on the effect of government restrictions on the access to comprehensive information. It also conflates the First Amendment right of access with a distinct common-law right and confuses a constitutional violation with the remedies available to redress that violation. Because neither precedent nor logic supports today's outcome, I respectfully dissent.

## I.

I begin with the First Amendment right of access's animating principles and scope, explaining why it covers more than mere physical attendance of proceedings. I then explain why, as we all agree, that right covers bail hearings.

## A.

Under established precedent from the Supreme Court, this Circuit, and other Courts of Appeals, we should affirm the decision of the District Court. I address each in turn.

## 1.

The First Amendment right of access serves vital interests: It "protect[s] the free discussion of governmental affairs" and "ensure[s] that . . . individual citizen[s] can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 604 (1982) (citation omitted). By "subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and

criticism," the right also plays an essential role in "effective judicial administration." *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966). And the right reaches its zenith when it comes to criminal prosecutions, which are matters of the "high[est] concern and importance to the people." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980) (plurality opinion).

Crucially, the First Amendment demands access not for access's own sake, but "to ensure that th[e] constitutionally protected discussion of governmental affairs is an *informed* one." *Globe Newspaper*, 457 U.S. at 605 (emphasis added) (internal quotation marks omitted). The essence of the right, in other words, is a commitment that the public be able to "acquir[e] information about" judicial proceedings, and it is that information which "contribute[s] to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system." *Richmond Newspapers*, 448 U.S. at 572–73 (plurality opinion) (second alteration in original) (citation omitted); *see Press-Enter. Co. v. Superior Ct.* (*Press-Enterprise I*), 464 U.S. 501, 513 (1984) (the First Amendment protects "access to information" about what happens during judicial proceedings).[2]

---

[2] Even Justices writing in dissent have understood the First Amendment right in these terms. *See, e.g.*, *Press-Enter. Co. v. Superior Ct.* (*Press-Enterprise II*), 478 U.S. 1, 18 (1986) (Stevens, J., dissenting) ("[T]he First Amendment embraces a right of access to information about the conduct of public affairs."); *Globe Newspaper*, 457 U.S. at 615 (Burger, C.J., dissenting) (focusing on whether the government "denied the public or the media access to information as to what t[ook] place

In multiple decisions addressing the First Amendment right of access, the Supreme Court has made clear that the public's right to information encompasses modes of compiling such information beyond mere attendance of proceedings. Begin with *Press-Enterprise I*. There, the Court held that the First Amendment gave the public the right to access written transcripts of lengthy voir dire proceedings, a portion of which had been open to the public. 464 U.S. at 503, 512–13. Granting the public "access to [the] information" in the transcripts, it explained, was the best way to "enhance[] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Id.* at 508, 513. Without a publicly available transcript, the Court cautioned, it would be "difficult for the[] [public] to accept what [it] [was] prohibited from observing." *Id.* at 509 (quoting *Richmond Newspapers*, 448 U.S. at 572 (plurality opinion)).

The Court continued down the same path in *Press-Enterprise II*, which involved a preliminary hearing in a criminal case. *Press-Enter. Co. v. Superior Ct.* (*Press-Enterprise II*), 478 U.S. 1, 3 (1986). Once again, the Court held that the First Amendment entitled the public to a transcript of that hearing. *See id.* at 3, 13–15. The value in public access to such after-the-fact information, the Court explained, is "that people not actually attending trials can have confidence that standards of fairness are being observed." *Id.* at 13 (quoting *Press-Enterprise I*, 464 U.S. at 508). Only then are the interests underlying the First Amendment right—enhancing "the appearance of fairness so essential to public confidence in the system,"

---

at trial," including in the form of "the trial transcript" and "other sources of information about the [relevant] testimony").

6

"giv[ing] assurance that established procedures are being followed and that deviations will become known," and supporting "the community therapeutic value of openness"—fully served. *Id.* (internal quotation marks and citations omitted).

In no case has the Supreme Court endorsed a narrow view of the First Amendment right limited to only one mode or form of access. Rather, the Court has recognized that the Amendment requires access to sources of information beyond in-person attendance that are capable of broader dissemination and that accurately capture the actions of the third branch of government.

**2.**

Until today, this Circuit has faithfully applied these principles. In multiple decisions, we have held that the First Amendment right of access covers not only in-person attendance of proceedings but also subsequent access to a verifiable, accurate, and comprehensive record of what happened during those proceedings.

Our first extensive treatment of these issues came in *Antar*. Like *Press-Enterprise I*, *Antar* involved voir dire proceedings. 38 F.3d at 1350. Unlike in *Press-Enterprise I*, in *Antar* the proceedings were not closed; although reporters had to leave the courtroom "to free up additional seats," members of the public were able to attend and observe. *Id.* at 1351. But in deciding whether it was constitutional to seal the transcript of the voir dire proceedings, we made clear that "the fact that the courtroom was open during those [proceedings] is of little import." *Id.* at 1359. Instead, "[i]t is access to the *content of the proceeding*—whether in person, or via some form of documentation—that matters." *Id.* at 1359–60 (emphasis added). As a

7

result, "the right of access to voir dire examinations encompasses equally the live proceedings and the transcripts which document those proceedings," *id.* at 1359, and an unjustified decision to seal the transcripts violated the First Amendment, *id.* at 1361, 1364.

Of particular relevance here, *Antar* instructs that for purposes of the First Amendment, "documentary access is not a substitute for concurrent access . . . and vice versa." 38 F.3d at 1360 n.13. "[O]penness," we explained, "is ongoing—a status rather than an event." *Id.* at 1360. And because "the heart of the Supreme Court's right of access analysis is the conviction that the public should have access to *information*," it would be illogical to limit access "only . . . to those who are able to be bodily present in the courtroom itself." *Id.*; *see id.* at 1360 n.14. Rather, "[t]rue public access to a proceeding means access to knowledge of what occurred there," and such access "is served not only by witnessing a proceeding firsthand, but also by learning about it through a secondary source." *Id.* at 1360. Without access to an accurate record of "what occurred" during the proceedings, the press would be unable to "function[] as surrogates for the public," and the public in turn would lose access to the "broad[] dissemination" of information required for it to "monitor, observe, and comment upon the activities of the judge and the judicial process." *Id.* at 1360–61 (citation omitted).

*Antar*'s bottom line is clear: "It would be an odd result indeed were we to declare that our courtrooms must be open, but that transcripts of the proceedings occurring there may be closed"—"for what exists of the right of access if it extends only to those who can squeeze through the door?" 38 F.3d at 1360; *see id.* at 1360 n.16 (emphasizing that the values

8

underlying access "can be fully vindicated only if the opportunity for personal observation is extended to persons other than those few who can manage to attend . . . in person" (quoting *United States v. Criden* (*Criden I*), 648 F.2d 814, 822 (3d Cir. 1981))).

*Antar* was not our last declaration that the right of access is "concerned with information, not with a particular means of communication," 38 F.3d at 1360 n.14. We returned to the issue in *Whiteland Woods*, which recognized a First Amendment right of access to meetings of a township planning commission.[3] 193 F.3d at 180–81. *Whiteland Woods* again

---

[3] In a later decision, we suggested this aspect of *Whiteland Woods* might have been dicta. *See N. Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 214 (3d Cir. 2002). It was not. In *Whiteland Woods*, a developer sought to videotape one of the commission's meetings but was denied. 193 F.3d at 178. After the township "agreed not to enforce the [videotaping] ban at future meetings," the developer sued for damages under 42 U.S.C. § 1983. *Id.* One obstacle standing in the way of the developer's damages claim was the argument that the First Amendment right of access did not apply at all to public proceedings of that kind. But after applying our experience-and-logic test, *see infra* Section I.B, we held that the developer "had a constitutional right of access" to planning commission meetings. *Whiteland Woods*, 193 F.3d at 180–81. Although ultimately we rejected the damages claim on narrower grounds, *see id.* at 184, *Whiteland Woods*'s analysis of the right of access's application remains an integral part of that decision, one not subject to erasure by a subsequent panel's comment. *See Pardini v. Allegheny Intermediate Unit*, 524 F.3d 419, 426 (3d Cir. 2008) (where a later panel decision "is inconsistent with [an earlier

9

underscored "that the Constitution protects the right to receive *information*," particularly "to protect the free discussion of governmental affairs." *Id.* at 180 (emphasis added) (citations omitted). And while we rejected the plaintiff's bid to elevate one mode of collecting information above all others by asserting a "right to videotape public meetings of [the] commission," we did so only because "other effective means of recording the proceedings [we]re available." *Id.* Specifically, because all interested members of the public could "compile an accurate record of the proceedings" through notetaking, "audio recording devices," and "stenographic recording," a video recording would not add anything "uniquely valuable" to the mix, which meant the videotaping ban did not "meaningfully restrict[]" the plaintiff's right of access. *Id.* at 183.

*Whiteland Woods* laid down clear markers for future cases. While the First Amendment "does not require states to accommodate every potential method of recording its proceedings," it does protect the public's right to "compil[e] a comprehensive," "accurate," and "full record" of those proceedings. 193 F.3d at 183–84. And if a government restriction "meaningfully interferes" with that right, it is unconstitutional unless the government can show it to be justified. *Id.* at 183.

Finally, we recently reaffirmed the distinction between contemporaneous observation and later-available documentation. The First Amendment, we explained, "protects the public's right of access to information about their officials' public activities" and "prohibit[s] government from limiting the stock

case, the later decision] must be deemed without effect." (citations omitted)).

10

of information from which members of the public may draw." *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017) (citation omitted). For that information to serve "citizen discourse on public issues," it must be "credible." *Id.* And on that score, in-person observation is no substitute for a recording capable of "wide[] distribut[ion] via different forms of media," because "record[ing] what there is the right for the eye to see or the ear to hear" is how we "corroborate[] or lay[] aside subjective impressions for objective facts." *Id.*

In sum, consistent with the Supreme Court's case law, our decisions establish that the First Amendment right of access is not limited to contemporaneous attendance of judicial proceedings. Rather, it covers various forms of information about what happened during those proceedings, including subsequent access to a comprehensive, accurate, and verifiable record. Restrictions that meaningfully interfere with that access are therefore presumptively unconstitutional.

**3.**

We find further confirmation in the case law of other Courts of Appeals, which likewise recognize that for purposes of the First Amendment, "[i]t is access to the *content of the proceeding*—whether in person, or via some form of documentation—that matters." *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 92 (2d Cir. 2004) (alteration in original) (emphasis added) (quoting *Antar*, 38 F.3d at 1359–60); *see also ABC, Inc. v. Stewart*, 360 F.3d 90, 99–100 (2d Cir. 2004) (endorsing *Antar*'s reasoning that "[d]ocumentary access is not a substitute for concurrent access, and vice versa").

11

The Second Circuit, for instance, has explained that subsequent access to a documented record is necessary to "endow the public and press with the capacity to exercise their rights guaranteed by the First Amendment" and to ensure that those rights are not "merely theoretical." *Hartford Courant*, 380 F.3d at 93. For that reason, it has held that the First Amendment demands not just in-person attendance but also subsequent access to docket sheets, *see id.*, and transcripts of live proceedings, *see Newsday LLC v. County of Nassau*, 730 F.3d 156, 165 (2d Cir. 2013) ("The transcript of a proceeding is so closely related to the ability to attend the proceeding itself that maintaining secrecy is appropriate only if closing the courtroom was appropriate."). Likewise, the Ninth Circuit has observed that because of the "significant role" that access to criminal proceedings "plays . . . in the functioning of the judicial process and the governmental system," the public has a right to access documents filed as part of postconviction motions for a sentence reduction. *CBS, Inc. v. U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 765 F.2d 823, 825 (9th Cir. 1985) (Kennedy, J.) (quoting *Globe Newspaper*, 457 U.S. at 606). The Eighth Circuit, for its part, has held that the right of access extends beyond mere attendance of criminal proceedings and includes, for example, documents filed in support of a search warrant affidavit. *In re Search Warrant for Secretarial Area Outside Office*, 855 F.2d 569, 572–73 (8th Cir. 1988); *see id.* at 573–74 (collecting similar decisions from other circuits). And the Fifth Circuit, acknowledging the need for "public confidence . . . in the integrity of criminal proceedings," has identified a First Amendment right to access transcripts documenting midtrial proceedings to investigate juror misconduct. *United States v. Edwards*, 823 F.2d 111, 115 (5th Cir. 1987) (quoting *Richmond Newspapers*, 448 U.S. at 572 (plurality opinion)).

Examples abound, but the point is this: As protected by the First Amendment, "access" means much more than the right to attend proceedings in person. It also covers subsequent access to information about what occurred at those proceedings. And while that information can take many forms, it must be enough to instill public confidence, facilitate debate, and allow for meaningful oversight of government institutions.

**B.**

Although we part ways about what the right entails, my colleagues and I agree on one thing: the First Amendment right of access applies to bail hearings, just as it does to a wide range of other government proceedings. *See* Maj. Op. 11 n.7 (recognizing that the Bail Fund has a First Amendment right to access bail hearings and transcripts created as a result of those hearings). Several of our sister circuits have reached the same conclusion. But because this is an issue of first impression for our Court, and because the reasons the right applies to bail proceedings also shed light on the points on which my colleagues and I disagree, I pause to explain what those reasons are.

Unlike its common-law cousin, *see infra* Section III.B, the First Amendment right attaches only where (i) "the place and process have historically been open to the press," which we call the "experience" prong, and (ii) "public access plays a significant positive role in the functioning of the particular process in question," which we call the "logic" prong. *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 673 (3d Cir. 2019) (citation omitted). Both prongs are satisfied here.

13

Start with experience. True, there is no "unbroken, uncontradicted history" of open bond hearings stretching back to time immemorial. *United States v. Chagra*, 701 F.2d 354, 362–63 (5th Cir. 1983) (citation omitted). But our case law does not require an uninterrupted, longstanding lineage. *See N. Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 213 (3d Cir. 2002). Indeed, in "the criminal context, relatively little history is required." *Id.* And here we have more than a little history: Public bail hearings in Philadelphia date back over half a century. *See* Caleb Foote, *Compelling Appearance in Court: Administration of Bail in Philadelphia*, 102 U. Pa. L. Rev. 1031, 1037 n.28 (1954).

Moreover, precedent demands that we "define[] the type of proceeding broadly" in order to benefit fully from "the 'judgment of experience,'" *Del. Coal. for Open Gov't, Inc. v. Strine*, 733 F.3d 510, 515–16 (3d Cir. 2013) (quoting *Press-Enterprise II*, 478 U.S. at 11). For instance, in a case involving *in camera* investigation of potential juror misconduct, we emphasized the "overwhelming historical support for access in other phases of the criminal process," which made us "reluctant to presume" a lack of openness for *in camera* proceedings absent clearer evidence of consistent closure. *United States v. Simone*, 14 F.3d 833, 835, 838 (3d Cir. 1994). Here, as in *Simone*, we note both the overwhelming openness of modern criminal proceedings, *see id.* (citing *United States v. Criden* (*Criden II*), 675 F.2d 550, 555 (3d Cir. 1982)), and the increasing centrality of bail hearings in criminal litigation, *see, e.g.*, *Seattle Times Co. v. U.S. Dist. Ct. for the W. Dist. of Wash.*, 845 F.2d 1513, 1516 (9th Cir. 1988) (bail proceedings "have grown increasingly important in the modern era," particularly since the Bail Reform Act of 1984); *see also United States v. Abuhamra*, 389 F.3d 309, 323 (2d Cir. 2004) (bail hearings "fit

14

comfortably within the sphere of adversarial proceedings closely related to trial"). Taken together, the evidence of the openness of modern bail proceedings, the dearth of any evidence of consistent closure, and the central role that bail hearings play in the overall criminal adjudicatory process satisfy the experience prong.

Now for the logic prong, in which we assess how openness facilitates "the interests of the People in observing and monitoring the functions of their government." *In re Avandia*, 924 F.3d at 673. Here, the case for openness is especially strong. A bail hearing is a pivotal moment in any criminal case: It typically "marks the start of adversary judicial proceedings," *Rothgery v. Gillespie County*, 554 U.S. 191, 213 (2008); informs the defendant of "the charge against him and [that] his liberty is subject to restriction," *id.*; provides "a powerful lever of coercive plea bargaining," as "someone who is locked up pending trial is likely to be fairly miserable and will have substantial difficulty assisting in his defense," Clark Neily, *Jury Empowerment as an Antidote to Coercive Plea Bargaining*, 31 Fed. Sent'g Rep. 284, 286 (2019); and may lead to pretrial detention, which itself has powerful and detrimental downstream consequences.[4] These pivotal proceedings

---

[4] *See, e.g.*, Will Dobbie et al., *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108 Am. Econ. Rev. 201, 204 (2018) ("Initial pretrial release increases the probability of employment in the formal labor market three to four years after the bail hearing by 9.4 percentage points, a 24.9 percent increase from the detained defendant mean."); *id.* at 203–04 (examining other effects of initial pretrial detention versus release); Erica Kates, Wellesley Ctrs. for Women,

15

naturally "attract significant public interest . . . and invite legitimate and healthy public scrutiny." *Chagra*, 701 F.2d at 363.

There are good reasons for the public to scrutinize bail proceedings. In bail hearings, as in all initial criminal proceedings, "the absence of a jury, long recognized as an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge, makes the importance of public access . . . even more significant." *Press-Enterprise II*, 478 U.S. at 12–13 (internal quotation marks and citation omitted). And there are many examples of the good that public access can produce. Perhaps the most famous comes from one of the major political events of the previous century: The Watergate scandal "might have been cut off at the pass" had Bob Woodward and Carl Bernstein not been able to discover "that high-priced lawyers were representing 'third-rate burglars'" at the initial hearing. *Chagra*, 701 F.3d at 363 n.25 (citation omitted). In more recent years, efforts to examine Philadelphia's bail hearings have uncovered disturbing trends; for example, in a multiyear study of thousands of

Moving Beyond Incarceration for Women in Massachusetts: The Necessity of Bail/Pretrial Reform 2, 4–5 (2015), https://bit.ly/2CseGoR (showing that almost 50% of women in pretrial detention were at risk of losing their homes); Megan T. Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, 34 J.L. Econ. & Org. 511, 512–13 (2018) (finding, based on data from Philadelphia, that "pretrial detention leads to a 13% increase in the likelihood of being convicted on at least one charge," "a 42% increase in the incarceration sentence," and "a 41% increase in courtroom debt"). I thank amici for identifying these helpful resources.

hearings, over 90% featured a magistrate who "imposed cash bail without even inquiring, as required by state law, about the accused person's financial ability to pay," and over 85% of arrestees "assigned monetary bail were also appointed counsel because of their indigency." Br. of Amici Curiae Cato Institute et al. 8. The Majority and I therefore agree that "the bail decision is one of major importance to the administration of justice, and openness will help to assure the public that the decision is properly reached." *In re Globe Newspaper Co.*, 729 F.2d 47, 52 (1st Cir. 1984); *accord, e.g.*, *Seattle Times*, 845 F.2d at 1516–17.

In recognizing today that the First Amendment right of access applies to bail hearings, we join three of our sister circuits. *See Seattle Times*, 845 F.2d at 1517; *In re Globe Newspaper*, 729 F.2d at 52; *Chagra*, 701 F.2d at 363–64; *see also, e.g.*, *United States v. Edwards*, 430 A.2d 1321, 1343–46 (D.C. 1981). And the reasons for this aspect of our holding also bear on what that right of access requires in this case. It is to that question that I now turn.

## II.

The merits here should be straightforward. The challenged restrictions meaningfully interfere with the public's right to a comprehensive and verifiable record of bail proceedings. And the Magistrates' proffered reasons for those restrictions fall well short of the showing required to justify such an interference. The District Court was therefore correct in finding a First Amendment violation, and we should affirm.

17

**A.**

The Bail Fund's First Amendment right of access has been infringed because (1) state and local policies prevent access to or compilation of a comprehensive, accurate record of bail proceedings (2) without providing an adequate alternative source for that constitutionally protected information. I explain each point below.

**1.**

The Bail Fund's suit challenges a trio of state and local restrictions that prevent it from recording bail hearings. See *Phila. Bail Fund*, 440 F. Supp. 3d at 419–20 (citing Pa. R. Crim. P. 112(C), Pa. R. Jud. Admin. 1910(B), and Phila. Mun. Ct. Arraign. Ct. Mag. R. 7.09). But the Fund does not challenge these restrictions in a vacuum. Rather, as the District Court recognized, it does so in light of other critical limitations: that the "Municipal Court does not make available to the public either its own official audio recordings or transcripts of the bail hearings," *id.* at 426, and that bail hearings occur without notice at a rapid-fire, unpredictable pace at any time of the day or night, making it impossible for the Fund to rely on in-person attendance and notetaking to compile an accurate and complete record. It is the cumulative effect of these rules and circumstances that produces the constitutional harm underlying the Bail Fund's request for relief.

And harmful it is indeed. With neither an official record nor the means to make a record of its own, the public is left "[un]informed," *Globe Newspaper*, 457 U.S. at 605, about a matter of the "high[est] concern and importance," namely the government's prosecution of criminal offenses, *Richmond*

18

*Newspapers*, 448 U.S. at 575 (plurality opinion). Informational gaps of this kind have grave consequences. For one, without active oversight from the public, the criminal justice system loses perhaps its best way to ensure "basic fairness." *Press-Enterprise I*, 464 U.S. at 508. Just as critical, "public confidence in the system" suffers, *id.*, because the public loses all "assurance[s] that established procedures are being followed and that deviations will become known," *Press-Enterprise II*, 478 U.S. at 13 (citation omitted). And when, by luck or circumstance, deviations *do* become known, they can all too easily be swept aside with a retort that they reflect isolated instances, inaccurate recollections, or subjective impressions. *See Fields*, 862 F.3d at 359 (emphasizing the need for an actual recording to "corroborate[] or lay[] aside subjective impressions for objective facts").

In the context of bail hearings, these issues are far from hypothetical. The soundness of Philadelphia's bail system is an issue of great and immediate public importance.[5] And the information the public has managed to gather about bail proceedings from existing sources, *see infra* Part II.A.2, has been deserving of that scrutiny. One study, for example, found that magistrates overwhelmingly ignored the obligation to inquire into an arrestee's financial situation before imposing monetary bail and often imposed seemingly unconscionable amounts,

---

[5] *See, e.g.*, Chris Palmer, *Tensions Are Boiling Over Between Philly DA Larry Krasner and Bail Reform Advocates*, Phila. Inquirer (July 29, 2020), https://bit.ly/3aqYUY1. *See generally* Report of the Special Master, *Phila. Cmty. Bail Fund v. Arraignment Ct. Magistrates*, No. 21 EM 2019 (Pa. Dec. 16, 2019).

often without explanation. *See* Br. of Amici Curiae Cato Institute et al. 8–9. The Bail Fund's court-watching efforts, too—hampered as they have been by the challenged restrictions—have turned up troubling evidence, including magistrates' ignoring arrestees' questions, "intentionally turn[ing] off their microphone[s] so that they could speak about [an arrestee's] case . . . without being heard by the [arrestee] or the observers," and making bail determinations outside the arrestee's presence. *See* Phila. Bail Watch & Pennsylvanians for Mod. Cts., Philadelphia Bail Watch Report: Findings and Recommendations Based on 611 Bail Hearings 20–21 (2018), https://bit.ly/2Fg41P5 [hereinafter Bail Watch Report]. But when the Fund has tried to raise these issues with government officials, it has been waved off, with the officials contesting the Fund's description of the "stated rationales for prosecutors' requests for cash bail" and the "frequency with which the Defender Association's representatives advocated for their clients" during bail hearings. J.A. 123. Accurate and comprehensive information about what occurs at bail hearings would eliminate these unnecessary credibility contests and produce the type of verifiable information on which public dialogue depends. And no doubt that information would reveal additional items of interest that deserve public attention.

The Majority does not directly dispute any of the foregoing. Instead, it advances three theories whose effect is to considerably diminish the scope of the First Amendment right of access as the Supreme Court and this Circuit have described it. I find support for none of those theories.

*First*, the Majority contends that *Whiteland Woods* forbids only restrictions that "meaningfully interfere with the public's ability to inform itself about" proceedings and, so long as

20

the public has *some* way to learn about the subjects or outcome of those proceedings, the First Amendment has nothing further to say. Maj. Op. 12. But in *Whiteland Woods*, the reason we rejected the plaintiff's claim was that, because public attendees were able to "use audio recording devices . . . or even employ stenographic recording," the videotaping ban at issue "did not curtail [the plaintiff's] ability . . . to compile an accurate . . . [and] comprehensive record." 193 F.3d at 183. Had those "alternative means of compiling a comprehensive record" been unavailable, videotaping would in fact "have provided a uniquely valuable source of information," *id.* at 183, thus requiring a different result. The Majority's reading, therefore, erases *Whiteland Woods*'s emphasis on the need for a comprehensive and accurate record and, in its place, substitutes a lower standard demanding only *some* publicly accessible information about the proceedings.

*Second*, the Majority argues that the Bail Fund "erroneously equates 'comprehensive record' with 'verbatim record,'" Maj. Op. 13, and, having rejected a *per se* requirement of a verbatim record, considers that to be the end of the analysis. But that should be only the beginning. I agree the First Amendment requires an "accurate" and "comprehensive record" of proceedings to which the right attaches, *Whiteland Woods*, 193 F.3d at 183, and does not guarantee a verbatim record in every context. That leaves, however, the question of what is required for an "accurate" and "comprehensive record." *Id.* And I believe the District Court was entirely correct that the Magistrates must either make their recordings available or allow the Bail Fund to create recordings of its own.

The bail hearings at issue in this appeal implicate personal liberty, form a vital component of the modern criminal

21

process, and are currently the subject of vigorous and extensive public debate.[6]  And the circumstances in which the hearings

---

[6] The Majority highlights that *Whiteland Woods* cited two out-of-circuit opinions approving nonverbatim modes of collecting information about government actions.  Maj. Op. 13–14.  It omits the third case *Whiteland Woods* cited, which rejected a bid to videotape proceedings only because "audiotaping was permitted."  *Id.* (citing *Johnson v. Adams*, 629 F. Supp. 1563, 1564–65 (E.D. Tex. 1986)); *see Johnson*, 629 F. Supp. at 1564 (emphasizing that "the public and the press [we]re allowed to audio tape the proceedings" using "a tape recorder or any other means of sonic reproduction" (citation omitted)).  And as for the two cases the Majority mentions, I find them to be of minimal assistance.  The first, which involved a one-day redistricting negotiation open to members of the press, arose in the context of a petition for a writ of mandamus.  *Combined Commc'ns Corp. v. Finesilver*, 672 F.2d 818, 819–20 (10th Cir. 1982).  That matters:  Mandamus is available only where the right at issue is "clear and indisputable," *Kerr v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 426 U.S. 394, 403 (1976) (citation omitted), but the *Finesilver* court faced "unsettled" territory ill suited to the writ, 672 F.2d at 821.  The second case, *Garrett v. Estelle*, 556 F.2d 1274 (5th Cir. 1977), involved a reporter who sought to "film executions in state prison," *id.* at 1275, and thus implicated unique interests related to "prison access," *id.* at 1278.  And *Garrett*, much like *Finesilver*, could not benefit from the Supreme Court's exegeses on the right of access in *Press-Enterprise I* and *II*, which came later in the decade.  Above all, neither *Garrett* nor *Finesilver* involved criminal hearings remotely like the bail proceedings here, and consequently their analysis has little to teach us.

22

are held make clear that a transcript, audio recording, or other verbatim record is necessary for members of the public to compile a complete and accurate record.  Before the District Court entered its order, the Magistrates refused to produce transcripts, refused to grant public access to the audio recordings they now acknowledge are of sufficient quality to create accurate transcripts, and simultaneously prohibited members of the public from using stenographic or recording devices to create their own record.  And, given that the parties' arguments and the judge's reasoning do not appear anywhere besides the spoken record, that hearings proceed at rapid pace with little or no advance notice, and that hearings occur around-the-clock every day of the week, the idea that any member of the public could be continually present and capable of capturing what is said is utterly unrealistic.  So, while the Magistrates need not provide transcripts, share their audio recordings, *and* permit members of the public to create their own recordings, they must ensure that at least one of those channels for compiling a "comprehensive record" remains available.  *Id*.

*Third*, the Majority asserts the First Amendment right of access is limited "to documentation already in existence." Maj. Op. 11.  I explain below why that view conflicts with governing case law, conflates the First Amendment right with a separate common-law right, and blurs the distinction between right and remedy.  *See infra* Section III.  But even on its own terms, the Majority's analysis does not support today's outcome.  As I mentioned at the outset, the Municipal Court creates its own audio recordings of all bail hearings, recordings now conceded to be of "sufficient [quality] to make certified transcripts."   Status Rpt. [Dist. Ct. Dkt. No. 59] at 2

23

[hereinafter Status Report].[7]  I fail to see how those recordings are anything other than records "already in existence," Maj.

---

[7] Initially, before the District Court, the Magistrates asserted the audio recordings were of "inferior quality" and were "often hard to hear." *Phila. Bail Fund*, 440 F. Supp. 3d at 418. Although that assertion was included among the stipulated facts, *see id.* at 418 n.5, we are obligated in this First Amendment case to undertake "an independent examination of the record," *see Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (citation omitted).  And two aspects of the record before us engender skepticism about the recordings' allegedly poor quality.  First, the recordings have always been of sufficient quality for the Municipal Court to use them for internal purposes, including not only "to address technical issues" but also "to enable the President Judge of the Municipal Court to monitor the performance of the magistrates." *Phila. Bail Fund*, 440 F. Supp. 3d at 418.  Second, in a status report filed with the District Court during the pendency of this appeal—which the Bail Fund brought to our attention via Rule 28(j) letter—the Magistrates reported that, to comply with the District Court's order, the Municipal Court had decided to "make available certified transcripts" of all bail hearings "created from the current audio recording technology present in arraignment court." Status Report, *supra*, at 2.  The status report stated that the Municipal Court "ha[d] taken steps to ensure that the audio quality [wa]s sufficient" to make transcripts, *id.*, but did not indicate what those steps were, which apparently did not involve changing the technology already in the courtroom.  In light of our independent obligation to view the record with fresh eyes and the uses to which the recordings have been put before and during this litigation, we cannot simply assume that

Op. 11, which would be covered by the First Amendment right of access under even the Majority's unduly narrow view of that right. Why then are we not affirming the District Court's order, which gave the Municipal Court the option of simply releasing those existing recordings to the public? That outcome would fall well within the ambit of previous decisions such as the *Press-Enterprise* duo and *Antar* even as the Majority reads them—and yet today the Court reverses, relieving the Magistrates of any incentive to release existing documentation that would provide the public with the information to which it is entitled.[8]

**2.**

To justify that outcome, the Magistrates and Majority point to two alternative sources of information for what happens during bail hearings: in-person attendance and notetaking, and documentation resulting from those hearings. Neither supplies the "accurate," "comprehensive," and "full record of the

---

they are of meaningfully poor quality as compared to others of their type.

[8] Perhaps the Majority views written transcripts as different in kind from other forms of recordings that are more audio–visual in nature. But if that is so, the grounds for that distinction are entirely unclear. After all, if the issue is that a court is preparing a recording for its own uses but refusing to allow the public to access it, why should it matter whether that recording is written or audio–visual? And why would the First Amendment have something to say about the former but not the latter?

25

proceedings" that the First Amendment requires. *Whiteland Woods*, 193 F.3d at 183–84.

*First*, contemporaneous attendance and notetaking are flawed substitutes for both legal and factual reasons. To begin with the legal, recall our explanation in *Antar* that, because "openness is ongoing—a status rather than an event"—"documentary access is not a substitute for concurrent access, and vice versa." 38 F.3d at 1360 & n.13 (emphasis omitted). *Antar* could not have been clearer: "The right of access encompasses both forms, and both are vitally important." *Id.* at 1360 n.13. Although this aspect of *Antar* figured prominently in the parties' briefs, it goes essentially unaddressed by the Majority. In my view, that is unfortunate: Under *Antar*, whether the initial proceeding is open to the public does not determine whether the public also has a right to subsequent documentation of what took place there.

The factual side is equally problematic. Despite the best efforts of the Bail Fund's volunteers—"most of [whom] are not lawyers and have limited familiarity with legal terms . . . [and] technical procedures"—"the volume of information and speed of arguments exchanged during each hearing, [together with] the quick, back-to-back nature of the hearings, make[] it impossible to document by hand everything that occurs." J.A. 123–24. And what is missed despite those efforts is, lamentably, lost for good: The hearings take place off the record, without written arguments and, unless bail is denied outright, with no statement of reasons for the magistrate's decision. Thus, whether for immediate, short-term, or long-term purposes, there is no comprehensive and accurate record on which the public can rely.

Nor can we take solace in the fact, *cf.* Maj. Op. 5, that in the event either party opts for an immediate telephonic appeal, the standard of review is de novo. The audio–video link connecting arrestees to the courtroom ends before any appeal begins. As a result, attending members of the public cannot hear the appeal, and the arrestee's testimony and any arguments or colloquy with the judge will be preserved, if at all, only through notes of counsel.[9] Indeed, the availability of an immediate off-the-record appeal may exacerbate the First Amendment injury here; if, for example, the magistrate in an initial bail hearing violates state law by failing to inquire as to the arrestee's ability to pay and the reviewing judge commits the same error, *neither* of those errors by public servants would be appropriately documented in an accurate and verifiable record. At both stages of the process, critical information about bail proceedings would escape memorialization and be forever lost to the public.

Further restricting the utility of in-person attendance is that bail hearings can occur "at any time of day on each day of

---

[9] Although I use the word "counsel," "[f]requently there are no lawyers in the room participating in the preliminary arraignment hearing." Bail Watch Report, *supra*, at 14. As of late 2018, for instance, "non-attorneys (e.g. paralegals, interns) often represent[ed] both the Public Defender's Office and the District Attorney's Office at the hearings." *Id.* And until recently, it was "extremely rare" for arrestees and their counsel to have any opportunity to confer and begin building an attorney–client relationship before the bail hearing or immediate appeal. Amici Br. of Defender Association of Philadelphia et al. 14–15.

the year," J.A. 58, with no notice to the public of the time, case number, of circumstances of any given arrestee's hearing before the instant it occurs. So while the courtroom doors are theoretically open, the Fund must ask its volunteers to camp out in the basement of the Criminal Justice Center day and night, with the lack of context and notice frustrating their efforts to compile comprehensive and accurate information about what occurs at each hearing. Such "merely theoretical" access, *Hartford Courant*, 380 F.3d at 93, cannot satisfy the First Amendment's stringent demands.[10]

*Second*, although "court documents related to [each bail hearing] are [later] filed of record," *Phila. Bail Fund*, 440 F. Supp. 3d at 419, those documents do not supply the comprehensive information that the First Amendment demands. After an arrestee's bail hearing, the public can access the criminal complaint, preliminary hearing subpoena, docket sheet, and any bail appeal report. It can also request bulk data containing basic information about each arrestee, offense, and disposition, though those requests cost $80 per hour of staff time expended and take up to eight weeks to process. These after-the-fact documents fall short for two main reasons.

---

[10] That is not all. As discussed below, *see infra* Section II.B.2, "due process requires some notice to the public before a trial court may close a pretrial criminal proceeding." *Criden II*, 675 F.2d at 558. When combined with the lack of court-produced transcripts or audio recordings and the prohibition on public recording of any kind, the lack of notice before bail hearings raises serious due process concerns.

One problem is the considerable delay between the hearings and access to the bulk data. As we have explained, delay in disclosure of information to which the right of access attaches can work a "uniquely irretrievable loss." *Criden II*, 675 F.2d at 559 (citing *Gannett Co. v. DePasquale*, 443 U.S. 368, 442 n.17 (1979) (Blackmun, J., concurring in part and dissenting in part)). Part of that irretrievable loss involves downstream effects, as "[l]ater events may crowd news of yesterday's proceeding out of the public view" or "an important event, such as a judicial election or the selection of a prosecuting attorney, may occur when the public is ignorant of the details of judicial and prosecutorial conduct." *Gannett*, 443 U.S. at 442 n.17 (Blackmun, J., concurring in part and dissenting in part). But the loss may also affect the proceeding itself, as "it is impossible to know what it would have been like had the pressure of publicity been brought to bear on the parties during the proceeding." *Id.* Either way, delay hinders the public observation and participation that the First Amendment is designed to protect.

More fundamentally, these after-the-fact documents provide at best a crude outline of what happened to which arrestees. As the Magistrates conceded at oral argument, there is no record whatsoever of the arrestee's testimony, counsels' arguments, or the magistrate's questions or reasoning. That is the very stuff of law and government. It is why our opinions do not simply state "Affirmed" or Reversed"; rather, we take pains to explain the parties' arguments and our reasoning precisely because it matters not just who a litigant is or what the court orders him to do, but also what arguments the litigant presented and what reasons the court gave in support of its decision. And it is that information—beyond factoids about the number of hearings or the bottom-line dispositions at those

29

hearings—that the public needs for sensible debate and meaningful oversight. Without those details, we cannot conclude the record is "comprehensive" enough, *Whiteland Woods*, 193 F.3d at 183, to satisfy the First Amendment.

To be sure, the Bail Fund and organizations like it have not given up on their missions to, as the Majority puts it, "enforce what [they] regard[] as justice." Maj. Op. 6. Their extensive efforts to attend bail hearings in person and document what they can through handwritten notes have not been entirely fruitless. But it is a mistake to treat the fruits of that labor as enough to remedy the constitutional violation here. The First Amendment is far more robust than that: It reaches beyond firsthand observations to subsequent documentation capable of broad dissemination, *Antar*, 38 F.3d at 1360–61 & 1360 n.14; demands a "comprehensive," "accurate," and "full record," *Whiteland Woods*, 193 F.3d at 183–84; and recognizes that the publicly accessible information must be credible and verifiable to serve the Amendment's fundamental purposes, *see Fields*, 862 F.3d at 359. Those robust protections have been violated here.

## B.

Because the challenged restrictions meaningfully interfere with the right of access to bail hearings, they are unconstitutional unless the government, based on specific facts, shows "an overriding interest . . . that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise I*, 464 U.S. at 502. It is no easy feat to satisfy this burden, and here the Magistrates come nowhere close.

30

**1.**

The Magistrates identify two interests that, they contend, support the restrictions: avoiding prejudice to arrestees and maintaining courtroom decorum. But they have not shown that either interest is compelling.

The Magistrates first suggest that allowing the Fund to record bail hearings would increase the risk of prejudicial pretrial publicity. Yet they have failed to identify a single case anywhere in which the existence of a recorded bail hearing prejudiced the defendant[11]—including in Philadelphia's Early Bail Review, a system allowing certain arrestees to challenge their bail determinations whose hearings are uniformly recorded. The Magistrates' concession, *see* Oral Arg. Tr. 26–27, is fatal given the requirement that restrictions on access must be supported by specific findings or evidence, *see Antar*, 38 F.3d at 1351, 1358–59.

Even if we were to grant the existence of some hypothetical risk of prejudicial publicity, that interest would not justify the severe restriction on public access at issue here. As a result of the Magistrates' recent commitment to allow arrestees

---

[11] That failure is stark given that all federal bail hearings, along with those in many states, are recorded. *See* 28 U.S.C. § 753(b); *see also, e.g.*, Alaska R. Ct. R. Admin. 35(a); Colo. R. Crim. P. 10(d); Mich. Comp. Laws § 767.37a(4); Minn. R. Crim. P. 5.09; Mont. Code Ann. § 46-11-701(1), (4); Neb. Rev. Stat. § 29-509; N.M. R. Rec. Jud. Proceedings 22-301; Ohio Rev. Code Ann. § 2937.15; Tenn. Code Ann. § 40-14-307.

31

and their counsel opportunities for confidential communications before and during bail hearings, counsel can now warn vulnerable arrestees about the downstream effects of anything said during the hearing. And as the Supreme Court has recognized, voir dire all but eliminates any risk of prejudice from public disclosure by allowing the trial court to "identify those jurors whose prior knowledge of the case would disable them from rendering an impartial verdict." *Press-Enterprise II*, 478 U.S. at 15. Given those mechanisms for risk mitigation, I fail to see how any possibility of prejudicial publicity could be "overriding." *Press-Enterprise I*, 464 U.S. at 502.

The second proffered justification, that of courtroom decorum, is even harder to credit. There is already considerable technology in the courtroom: The Municipal Court produces its own audio recordings, arrestees and prosecutors can cause their own audio recording to be made at any time, arrestees appear by audio–video link, and all Early Bail Review hearings feature a stenographer. Yet as the Magistrates conceded at oral argument, they have not identified a single instance in which any of that technology had any ill effect on decorum. And once again, even ignoring the lack of evidence and crediting the Magistrates' bald assertion, there is a readily available option for risk elimination: Under the District Court's order, the Municipal Court could simply make its own recordings or a transcript available to the public and continue to enforce its technological ban. Indeed, that is exactly what it has done since at least June 2020 in response to the District Court's order—again, without any loss of decorum that the Magistrates could identify. An interest in courtroom decorum therefore cannot justify the infringement on the right of access the Bail Fund has identified.

32

**2.**

Apart from the lack of evidence in support of the challenged restrictions, we confront an independent problem: that those restrictions are not narrowly tailored.

That is putting it mildly, as the restrictions are not tailored at all. They do not apply only upon specific showings of possible prejudice or likely breaches of courtroom decorum. Rather, they extend to every one of the thousands of bail hearings that take place every month in Philadelphia. Additionally, because no audio recordings or transcripts of those hearings are later shared with the public, there are no means to try to remedy initially overbroad restrictions on access through the subsequent release of appropriately redacted transcripts. That across-the-board feature alone suggests that, even taking the asserted interests at face value, the means chosen to serve them cannot stand.[12]

---

[12] The blunderbuss nature of the restrictions approved today also sets this Court on a collision course with the Due Process Clause. As we have explained, where (as here) the First Amendment right of access attaches, "due process requires some notice to the public before a . . . court may close a pretrial criminal proceeding." *Criden II*, 675 F.2d at 558. Although the "form that such notice should take" may vary from context to context, at least for preliminary hearings we have required it to be "calculated to inform the public that its constitutional rights may be implicated in a particular criminal proceeding" and to be docketed "sufficiently in advance of [the] hearing . . . to afford interested members of the public an opportunity to intervene and present their views." *Id.* at 559. We are not called on today to set the constitutional baseline for

Further, as in all cases involving narrow tailoring, we must be attentive to underinclusivity that "leaves appreciable damage to [a] supposedly vital interest unprohibited." *Reed v. Town of Gilbert*, 576 U.S. 155, 171–72 (2015) (citation omitted); *see United States v. Marcavage*, 609 F.3d 264, 289 (3d Cir. 2010) (underinclusivity can both "suggest[] that the government's supposedly vital interest is not really compelling" and "show that the law is not narrowly tailored" (internal quotation marks and citation omitted)). And here, we confront restrictions riddled with exceptions.

The most obvious is that the Municipal Court itself already creates audio recordings of each bail hearing, which are currently being used to produce publicly available transcripts. But there are other exceptions as well. Under state law, the magistrate, prosecutor, or arrestee "may cause a recording to be made of the [hearing] as an aid to the preparation of the written record for subsequent use in [the] case." Pa. R. Crim. P. 112(D). And all proceedings in the Early Bail Review system discussed above are recorded. That these several other means of recording are allowed, with no identifiable consequences for the conduct of bail hearings or for arrestees' rights, seriously calls into doubt the Magistrates' proffered justifications.

---

notice due before a bail hearing may be closed. Even so, I raise the issue to underscore the fundamental inconsistency between the Magistrates' and Majority's agreement that the right of access attaches to bail hearings and their simultaneous approval of a system that provides no before-the-fact notice and no after-the-fact record of those hearings.

Together, the weakness of those justifications and the inartful manner in which they are tailored preclude us from finding them consistent with the First Amendment,[13] and we should affirm the District Court's identical conclusion.

---

[13] Some have wondered whether limitations on the right of access to judicial proceedings may be akin to time, place, and manner restrictions on expressive activities. *Richmond Newspapers*, 448 U.S. at 581 n.18 (plurality opinion). We have expressed doubts about that idea, particularly as right-of-access jurisprudence does not map neatly onto the forum analysis required by the Free Speech Clause. *Whiteland Woods*, 193 F.3d at 182–83; *see PG Publ'g Co. v. Aichele*, 705 F.3d 91, 99–100 (3d Cir. 2013) (because the right of access "focus[es] . . . on access to information," not "expressive conduct or speech," "the traditional forum analysis is [in]apposite"). And however far a time-place-and-manner line of thinking may extend in this context, it does not cover restrictions—like the ones here—whose effect is "to deny or unwarrantedly abridge . . . the opportunities for the communication of thought and the discussion of public questions" essential to the right of access. *Press-Enterprise I*, 464 U.S. at 511 n.10. Still, even if we were to set these doubts to one side, the proffered justifications here would remain concededly unsubstantiated and therefore would not pass muster under even the most forgiving of the tests used in public forum analysis. *See NAACP v. City of Philadelphia*, 834 F.3d 435, 443–44 (3d Cir. 2016) (holding that the government must prove the reasonableness of any regulation in a limited public or nonpublic forum through "record evidence or commonsense inferences" and that where the record "is strangely void of support," the regulation cannot stand).

### III.

In reaching a different result, the Majority treats this case as one about the existence *vel non* of judicial records. But that view conflates the constitutional right of access with its common-law cousin and confuses the constitutional right at issue here with the set of remedies available to redress violations of that right. As I will explain, both those points of confusion lead the Majority away from settled ground and into uncharted territory.

### A.

The Majority asserts that the law requires only "that judicial records—assuming they exist—[be] generally available to the public." Maj. Op. 10 (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)). Its lone citation is to a case "discussing the common law right of access to judicial records." *Id.* But that common-law right has distinct justifications and coverage as compared to its constitutional cousin, and it is often a mistake to transplant principles from one into the other. This is a case in point.

I have explained that the First Amendment right of access, which seeks to protect the public awareness and participation on which our democracy depends, guarantees access to information about what occurs at government proceedings. *See supra* Section I.A. The right that flows from common law, on the other hand, predates the Constitution and Bill of Rights, *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 343 (3d Cir. 1986), and focuses on the public's ability "to inspect and copy public records and documents, including judicial records," *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001).

36

In many ways, that common-law right "is narrower than the First Amendment right." *N. Jersey Media*, 836 F.3d at 434. First, while the First Amendment captures information that "plays a significant positive role in the functioning of the particular process," *id.* at 429 (citation omitted), the common-law right asks only "whether [the document at issue] is considered to be a 'judicial record'" based on whether it was "filed with the court" or "incorporated or integrated into . . . adjudicatory proceedings," *id.* at 434 (first alteration in original) (citation omitted). The First Amendment also "requires a much higher showing that the common law right . . . before a judicial proceeding can be sealed." *In re Cendant*, 260 F.3d at 198 n.13. Given these asymmetries, we have repeatedly cautioned that the First Amendment and common-law rights are "distinct" and must be analyzed separately. *In re Avandia*, 924 F.3d at 670; *see, e.g.*, *id.* at 672–74; *N. Jersey Media*, 836 F.3d at 428–36.

We should hew to that approach here. Focusing on whether "documentation [is] already in existence," Maj. Op. 11, may well be appropriate for the common-law right, as a document that does not exist cannot have been "filed with the court" or "integrated into . . . adjudicatory proceedings," *N. Jersey Media*, 836 F.3d at 434 (citation omitted). But it is a poor fit for the First Amendment right, which guarantees access to information the public needs to monitor government officials' behavior and debate sound policy. After all, if a document's "existence" were all that mattered, rights of documentary access long recognized as protected by the First Amendment—including to transcripts of voir dire, *Press-Enterprise I*, 464 U.S. at 510–13; *Antar*, 38 F.3d at 1351, and preliminary hearings, *Press-Enterprise II*, 478 U.S. at 13; *Criden II*, 675 F.2d at 554—could be erased if the government simply chose

not to produce the document. Fortunately, the Constitution does not leave the rights it enshrines so vulnerable to the whims of the officials it regulates.

To put the issue into sharp relief, consider how the Majority summarizes *Antar*'s holding: "that, *assuming there are transcripts* of a proceeding, the First Amendment right of access extends equally to the transcripts as well as the courtroom proceedings." Maj. Op. 11. A diligent search through *Antar* for conditional language of this sort, or any other indication that documentary preexistence was necessary to its reasoning or outcome, would be in vain. To the contrary, *Antar* made clear that "[i]t is access to *the content of the proceeding . . .* that matters." 38 F.3d at 1359–60 (emphasis added); *see also id.* at 1360 n.14 (emphasizing that the right of access is "concerned with information, not with a particular means of communication"). Thus, although the right of access protected by the First Amendment can involve various "form[s] of documentation," *id.* at 1360, it in no way depends on the preexistence of a judicial record to which the common-law right of access would attach. The Majority's contrary suggestion defies our case law, which as a panel we are bound to follow. *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 293 & n.13 (3d Cir. 2018).

**B.**

The Majority also views this case as if it were about an asserted First Amendment right to create audio recordings. It is not. It is, as are all First Amendment right of access cases, about the right to *information*—comprehensive and accurate information on which the public can rely in overseeing representatives and debating policy. Of course, once a court finds infringement of the right to access such information, it must

then remedy that infringement. And in cases (like this one) where the plaintiff seeks equitable relief, the court "ha[s] substantial flexibility," *Brown v. Plata*, 563 U.S. 493, 538 (2011), in choosing among viable "means of compiling [the necessary] comprehensive record," *Whiteland Woods*, 193 F.3d at 183. *See also Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978) (emphasizing that "breadth and flexibility are inherent in equitable remedies"). This distinction between right and remedy is critical here, as it supplies the appropriate lens through which we should view the District Court's decision.

After an extensive examination of the undisputed facts, the District Court found a First Amendment violation: that the challenged rules, together with the fact that the "Municipal Court does not make available to the public either its own official audio recordings or transcripts of [those] hearings," *Phila. Bail Fund*, 440 F. Supp. 3d at 426, meaningfully restrict the public's access to comprehensive information about the hearings. To redress that violation, the District Court engaged in a thoughtful exercise of equitable discretion. It emphasized that "the validity of the court rules in question," including the blanket ban on public recording, could "be saved by [the court's] making such audio recordings or transcripts publicly available." *Id.* The District Court therefore put that choice in the Municipal Court's lap, reserving the remedy the Bail Fund sought—the ability to make its own audio recordings—for only the circumstance where the court chose not to produce the information itself. The District Court's remedy was appropriately tailored to the "nature and scope of the constitutional violation," *Tillery v. Owens*, 907 F.2d 418, 429 (3d Cir. 1990) (citation omitted), and was highly attentive to federalism concerns, *see O'Shea v. Littleton*, 414 U.S. 488, 499–500 (1974).

39

Moreover, that carefully designed remedy has proved capable of administration. Using the "current audio recording technology [already] present" in arraignment court, the Municipal Court has opted to produce transcripts available for online ordering on a similar fee and delivery schedule "as for [all] other proceedings." Status Report, *supra*, at 2. That is an appropriate and fitting outcome to this dispute. And it should put to rest any concerns that this case is about a plaintiff's right to dictate whatever form of record compilation it most prefers.

\*     \*     \*

On the whole, the Majority places too much emphasis on essentially irrelevant questions—ones that would be better addressed in a common-law case or dispute over the permissible scope of equitable discretion, neither of which is presented here—and not enough emphasis on what the Supreme Court, this Circuit, and other Courts of Appeals have had to say about the constitutional right at issue. Thus, although I join my colleagues in recognizing the First Amendment right of access to bail hearings, I cannot endorse the remainder of their analysis.

**IV.**

Without the free "circulation of information and ideas," "government by the people [is not] a workable reality." *Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164, 1167 (3d Cir. 1986) (en banc). For that reason, the First Amendment embodies a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Central to that commitment is a promise of ongoing access to comprehensive information about what takes place in judicial

40

proceedings, especially those criminal proceedings that may lead to deprivation of liberty.

That promise is left unfulfilled today.  While this case arises in the context of bail hearings, the Majority's holding will reverberate far beyond the confines of the Magistrates' basement courtroom, with troubling consequences for a wide range of judicial and other governmental proceedings.  Public dialogue is only as rich as the information on which it is based, but today's decision covers the public's ears and shrouds the public's eyes.  Because that decision conflicts with our precedent and will inflict deep and lasting harms on the right of access and the values that right serves, I respectfully dissent.